UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE OTIS D. WRIGHT, II, U.S. DISTRICT JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. JOSEPH CORNELL WHITFIELD and ANTUAN DUANE DUNLAP, Defendant | Case No. CR 13-00126-ODW-2 CR 13-00126-ODW-3 |

REPORTER'S TRANSCRIPT OF
BAIL HEARINGS
THURSDAY, JUNE 19, 2014
1:34 P.M.
LOS ANGELES, CALIFORNIA

DEBRA READ, CSR 3949, CRR
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET 432A
LOS ANGELES, CALIFORNIA 90012
READIT3949@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

ANDRE BIROTTE, JR.
United States Attorney
BY: JEAN-CLAUDE ANDRE
BY: MARK YOHALEM
Assistant United States Attorneys
United States Courthouse
312 North Spring Street
Los Angeles, California 90012

**FOR THE DEFENDANT JOSEPH CORNELL WHITFIELD:**

SONIA E. CHAHIN LAW OFFICES
BY: SONIA ELIZABETH CHAHIN
Attorney at Law
2222 Foothill Boulevard Suite E-278
La Canada, California 91011
818-549-0149
SEChahin@aol.com

**FOR THE DEFENDANT ANTUAN DUANE DUNLAP:**

LAW OFFICES OF LAWRENCE JAY LITMAN
BY: **LAWRENCE JAY LITMAN**
Attorney at Law
515 South Flower Street
Suite 3600
Los Angeles, California90071
310-228-7245
Ljlitman@cox.net

Also Present:

ANDRE GOULART, Pretrial Services Officer

LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 19, 2014

1:34 P.M.

-OOO-

THE COURTROOM DEPUTY: Remain seated and come to order. This United States District Court is once again in session.

Calling items 2 and 3, CR 13-126, United States of America versus Joseph Cornell Whitfield, et al.

Counsel, may I have all your appearances.

MR. ANDRE: Good afternoon, your Honor.

John-Claude Andre on behalf of the United States. With me at counsel table is Assistant United States Attorney Mark Yohalem.

THE COURT: Gentlemen.

MS. CHAHIN: Good afternoon, your Honor.

Sonia Chahin on behalf of Joseph Cornell Whitfield who's present in custody.

THE COURT: Counsel, good to see you again.

Mr. Whitfield.

MR. LITMAN: Good afternoon, your Honor.

Lawrence Jay Litman appearing for defendant Antuan Dunlap who's present in custody.

THE COURT: All right. Mr. Litman. Mr. Dunlap.

All right. We're here for bail hearings. I'll let the attorneys, you know, talk, but, you know, I've got Pretrial

Services's view. I'm somewhat familiar with these gentlemen. I've got my own view, but I'll try to keep an open mind until I've finally made a decision. But I'm pretty sure that I know where the Government is. The Government wants detention and the Government argued that there's no way we can assure that these folks will appear at trial. And I know with respect, I think, to Mr. Dunlap, the Government is really upset that he's not on somebody's basketball team, and I would imagine there's also the argument that they are a danger to the community.

But, Mr. Andre, go ahead.

MR. ANDRE: Yes, your Honor. You're correct that the Government seeks detention. What we think is particularly remarkable, for the 13 months between when Mr. Dunlap was arrested and this Court's March 10th dismissal order as to him and the 16 months between Mr. Whitfield's arrest and this Court's dismissal order from this Monday as to him, nobody ever contested that there were no combination of conditions of bond that could mitigate the danger and flight risk to the community.

THE COURT: Was it something that someone needed to address during that period?

MR. ANDRE: They certainly could have if they wanted to.

THE COURT: But why? Why would they have?

MR. ANDRE: Because the Government moved for

detention upon their initial appearance. In fact, Defendant Dunlap asked for a continuation of his hearing that was put over and Judge Woehrle held a second hearing. In both cases the defendant submitted on detention, submitted on the Pretrial Service's recommendations. Pretrial Services has been steadfast in its belief that no combination of conditions can mitigate their flight risk and danger, as have we, and again, defendants didn't contest it until -- really the only dispute arose in March of this year when Defendant Dunlap didn't dispute that he was a danger, but instead said, "I'm not a flight risk because I'm living in the same area and I'm on this basketball team." As we pointed out to the Court, living in the same area apparently means he was homeless, living in his car, and it has been proven I think beyond dispute that he's not on any basketball team of either of the two colleges that it possibly could be.

THE COURT: I think it was his attorney who made that argument that all these efforts by the Government to locate him, you know, all that was necessary was that they, you know, check the starting lineup of some school. I know it wasn't UCLA, but anyway.

Okay. I wish he were in school. I wish you were both in school.

All right. I got you. But, you know, in fairness, the focus I think for these two gentlemen and their attorneys

shifted in the early part of this year from detention to a much bigger prize. But be that as it may.

Let me say this. Monday when we were here on a hearing for Mr. Whitaker[*sic*], when the Court saw, you know, for the first time the Ninth Circuit's order which stated, among other things, that we were to issue a warrant for Mr. Dunlap's arrest, Mr. Dunlap is sitting here. He doesn't have to be here. I don't even know why he was here. But it doesn't look like he's on the run. And I asked Mr. Dunlap to self-surrender, and looking at the jewelry around his wrists, I say he has done that.

I am not concerned. All right? So I know the Government's concerned. I am not concerned based upon what I've seen.

All right. What about Mr. Whitfield?

MR. ANDRE: Your Honor, if I could also address one more point about Mr. Dunlap.

THE COURT: Sure.

MR. ANDRE: In the way we read the Circuit's order is that the Circuit reversed this Court's prior ruling that section 3143(c) does no work when the entire indictment is dismissed and that 3142(e)'s presumptions no longer apply when a case triggering those presumptions -- or when a charge triggering those presumptions has been dismissed.

In light of that, the Court's analysis must be -- and this

is how we read the Circuit's order -- the same as if they were back before Judge Woehrle before this Court dismissed the indictment. And in light -- certainly admirable that Dunlap has shown up here today, but he has never addressed his danger to the community, and frankly it was easy for him to self-surrender because he was in custody the day before in Twin Towers after not clearing his own warrants upon being released by this Court.

THE COURT: I don't understand why was it easy for him to self-surrender. He was walking around here free when he heard us discussing the Ninth Circuit's order that an arrest warrant was to be issued for him. He could have walked out that door and been gone. He did not have to walk himself down to MDC.

MR. ANDRE: My understanding is that Mr. Dunlap was in local custody at the time and then --

THE COURT: I saw him. We talked right here in this courtroom. He was free Monday. Did I hallucinate?

That was you, right?

THE DEFENDANT DUNLAP: Yes, sir.

THE COURT: Okay. Whatever. Yeah, the Government has filed an appeal and I looked through 3143(c) to make a decision as to whether or not they should be released or detained, and I have to still look at 3142, and I've looked at all of those factors under 3142(g). I don't see this guy's a

danger, but I understand that the Government does, and I want to give the Government an opportunity to articulate those views.

MR. ANDRE: Okay. Thank you, your Honor.

The defendant has a prior for assault with a firearm. It's undisputed he has a gang association. He has a grand theft conviction, two priors for robbery and --

THE COURT: Oh, you just reminded me of something. Do you realize your papers contain his juvenile record?

MR. ANDRE: Uhm --

THE COURT: Okay. I'm not going to hold that against you. But anyway, his papers contain his juvenile record and it's posted on our electronic case management system for all to see. But that's all right. That's not you.

MR. ANDRE: Well, it's the Government and I will look at it, and if that's the case, I'll be happy to submit an ex-parte to seal that document, if the Court would approve that.

But in addition to the actual prior convictions that Mr. Dunlap has, in this case he boasted of robbing a Western Union with a Taser and also --

THE COURT: Boasted of. Boasted of.

MR. ANDRE: And under the Ninth Circuit's *Black* decision, there's a footnote where the Court says that, you know, law enforcement agents and courts can take such boasting

into account --

THE COURT: But when?

MR. ANDRE: -- and credit it when the defendants have prior criminal histories that are similar. And in this case the defendant does. He has two prior robbery convictions, grand theft and assault with a firearm. All those are not too far removed from robbing a Western Union and a check cashing store.

And if I could turn to I guess, your Honor, this surety the defendant has proposed. I mean, as the Court knows, an unsecured bond or a signature bond is generally pretty worthless, I mean, unless the person has deep pockets and the Government can actually seek to enforce it if there's a violation.

In this case, the only surety offered by the defense is a $50,000 unsecured bond signed by his aunt who's been unemployed for two years and who's unaware of how many siblings he has. We think that even if, you know, any bond could possibly mitigate his flight risk and danger, that that bond is similarly inadequate.

THE COURT: I agree with you 100 percent, at least on that part.

MR. ANDRE: Would the Court like me to turn to Mr. Whitfield now?

THE COURT: You can.

MR. ANDRE: Thank you, your Honor.

Mr. Whitfield I think is in an even more difficult position. Certainly on the scope of culpability in this case, we feel he's more culpable than Dunlap, but he's also made no showing whatsoever as to sureties to mitigate his flight risk and danger. He has priors for rape -- for attempted rape, firearm offenses. He similarly made comments during investigation in this case that if the police were called, he would shoot up their car. He gave a demonstration of his shotgun in which he told our confidential informant that the nine-pellet-per-casing rounds that he used would take off someone from the neck down -- certainly is a danger in that regard; has four parole violations which shows he's not willing to subject himself to authority.

And so we think that, you know, under those circumstances that, again, there is no combination of conditions for bond that can mitigate his flight risk and danger, and he hasn't even attempted to offer one in this case.

And also, I guess, he failed to register as a sex offender in Nevada, so there's a lot going against Mr. Whitfield in the Government's view, your Honor.

THE COURT: Uh-huh.

MR. ANDRE: That's all I have for now. Thank you.

THE COURT: That way I know you're done.

MR. LITMAN: Your Honor, good afternoon.

THE COURT: Mr. Litman.

MR. LITMAN: Thank you.

With respect to the concerns of the Bail Reform Act and there being a reverse onus, I'd submit that if the defendant is required to rebut those presumption, then we will do so right now and provide the Court with analysis of --

THE COURT: Here's the problem I have with the need to even deal with the presumption. The presumption assumes that he is looking at a lot of time, and because he's looking at a lot of time, there's a motivation for him to flee. But I have it on pretty good terms and from a pretty good source he probably isn't looking at a lot of time.

MR. LITMAN: My point.

THE COURT: And that's what goes into my calculus. But go ahead. I'm sorry. I interrupted you.

MR. LITMAN: Well, that -- you pulled the words right out of my mouth, that the Defendant Hudson in this case was sentenced. He was the most culpable defendant of any of the defendants here. He was sentenced to six years. So my client is -- was going to trial prior to this dismissal motion, is aware that the defendant who was most culpable and received six years, in my mind and my submissions to my client, he's facing less than six years. He's already served one year, so at max I'm advising my client, rightfully or wrongfully, that this Court will not give him more than six years.

So he -- the rebuttal of the presumption of him fleeing because he's facing a 10-year or more sentence is in this case not the case because of what's happened by previous defendants.

So it is my submission that he is aware that -- and that if he goes to trial, if -- a number of circumstances if and if and if, because we do have an appeal and it is -- that is a factor that the defendant has to consider whether he's going to win the appeal. So all things going bad his way, he still is only facing an additional four years of jail.

MR. ANDRE: If I may interrupt, your Honor. Given that Mr. Dunlap is not subject to one of the plea agreements like Defendant Hudson and Defendant Whitfield, Dunlap is subject to at least a 15-year mandatory minimum should he proceed to trial and be convicted, though.

THE COURT: Why?

MR. ANDRE: Because of the 924(c) and the 846 charging a 10-year mandatory minimum quantity. It may even be higher. My apologies if I'm unfamiliar with how the priors may figure into the equation, but it's at 15-year mandatory minimum. And the reason why Defendant Hudson was able to get the six-year sentence that he did is that the Government agreed to dismiss or make him not plead to the 846 charging a 10-year man. min., just plead to the 924(c) and no drug quantity on the drug charges.

THE COURT: Okay.

MR. LITMAN: Well, in response to that, it will be submitted that should we need to, that there's sentencing enhancements and certainly sentencing enhancements -- sentencing entrapment, and certainly sentencing entrapment allow a Court to go below the mandatory minimums. And in this case, I believe the Court has already found in Hudson's case that there was a sentencing entrapment so that it would be able to get below the mandatory minimum.

And indeed, both on the sentencing entrapment for the drugs and the sentencing entrapment as would be alleged if we had to go forward on this matter, it would be with respect to the gun charge as well, so that the Court would not be bound to those mandatory minimums.

I've advised Mr. Dunlap, rightfully or wrongfully, that the most he's going to face here is six years. And so in his mind he's looking -- in his mind in terms of whether he decides to flee or not flee, he's looking at four years, if even that, because I submit and I will submit if I have to at a later date that the Court should grant him, if he is convicted by a jury, time served. So -- and the Court will have the jurisdiction to do that based on the arguments. Despite there being a mandatory minimum, those entrapment laws allow the Court to go below them.

So I'd submit that the reverse onus of him being a flight risk because he's facing 10 years or more and because the

allegations of the Government are that he should get 15 years, I submit and I'm advising the client that that's not going to happen. So I submit that rebuts the presumption of a flight.

Secondly, as I mentioned and as you mentioned, he was aware of a appeal being filed I think when the Government filed it on the 10th or -- the judge -- the dismissal was on the 10th of March and the -- and the appeal was filed back in late March. He was aware that he could lose the appeal and that he could be back to be tried and face sentencing, and he could have fleed at that time. It wasn't just within the last couple days when the Ninth Circuit said he had to be arrested that he surrendered. He was always willing. And I have notified the Government at -- throughout the last three months at any time that arrest warrant is issued by the Ninth Circuit, that he will surrender and it wouldn't be necessary.

There is the discrepancy in terms of his enrollment in school and his basketball team, and I wanted to explain those discrepancies. He did, indeed, file an application at the college and was provided with a badge and enrollment card, so he did enroll. He was subsequently derolled because he didn't have the money for his -- his tuition. So he was practicing at the school with the basketball team, but was not actually on it, and so I wanted to clarify to the Court. And if the Court needs further explanation as to what it's -- what he said and I said in the pleading, he was not on the basketball team because

there was no basketball team at the time, but he was enrolled and applying to be on the basketball team and was practicing at the school, at the same place where Coach Higgins said he never saw him. He was there and he still says today that he's been there for three days a week at the school practicing.

And although he's not on that particular basketball team because he has to be in enrolled to be on the team by rules, he's practicing and playing with the scrub team that plays there every day after the practices.

He also intends to get a job. He's had an interview and hopes to get a job this week, if released. And that will allow him to pay his tuition which will allow him to enroll and then allow him to actually try in the basketball team. So the hopes would be that if the Court of Appeal should reverse your decision, which I submit it won't and I'll argue that, I think the likelihood of appeal in this case, as Government has argued that the Court ignored the Ninth Circuit in *Black*, I dispute that vigorously with the Government. I did in the Court of Appeal. This Court used the rules and tests of *Black* and followed the tests enunciated by the Ninth Circuit and applied it to the facts, and therefore, I submit that it's going to be very difficult for the Court of Appeal to overturn that ruling, and therefore, the likelihood of all these ifs, ifs, ifs add up to the point where my client is certainly aware of the possibility of being incarcerated should the Court of Appeal --

and that ignores the opportunity of him to have a trial because he has at all times in this matter maintained his defense to the charges of conspiracy. And the Court heard and saw those videos and that will lead me to address the issue of the danger.

The only danger -- the Government alleges the indictment in this case, which it did before Judge Woehrle, and all we had at that time before that bail hearing was the allegations contained in the indictment. So we submitted on the danger because of the indictment. Once we had seen the tapes and discussed the matter with the client as to his involvement, I -- it's submitted that there is no danger. This client was there at a certain time and a certain place and will identify, if he needs to at trial, while he was there -- why he was there, why he was there the first time. And how he got there the second time will be identified at trial.

And I can tell this Court that the second time that he was there, he did not even know he was going to be there till the doors opened. He was not part of the plan. You saw the videos, I believe. He's walking around as if nothing's happening and talking on the phone while other people are doing anything. He's eating pizza and looking at tennis shoes. So it will be submitted that his intention in this matter was never to go forward with it.

It's submitted that his past history relates to activities

that were mostly when he was a minor. The -- I think the assault charge that is on his record related to an air pistol and a fight with a neighbor and his father over an air pistol. So despite the fact that he's charged with a gun charge and a robbery charge, that was an air pistol dispute with a friend of his father.

And finally, with respect to the allegations that were made in those tapes which you saw -- which Judge Woehrle did not see and we did know about them -- those statements are all of puffery and are there to, I guess, get the job that the -- the set-up was trying to enlist. They were also made, as he would testify at trial, out of fear because he just found himself in a room with what he believed to be a bunch of Mexican Mafia killers and his ability to leave a room or say anything was very limited. So he will, if have to go to trial, testify as to what he said and why, but those statements were not -- not correct. They were told to the undercover agents to deal with whatever he thought might happen if they didn't believe him or want him involved.

And if the Government had believed this, they would have proved before the Court these actual charges because there were no -- there were no incidents of those Western Union or check cashing robberies that were ever reported. They were indeed made up. I submit that those factors that I've just referred to do rebut any presumption that the -- of the flight or the

danger to community.

THE COURT: All right. Ms. Chahin, I'm going to get to you.

MS. CHAHIN: Thank you, your Honor.

THE COURT: Mr. Dunlap, I just want to say this. You know, if you are given an opportunity to reenroll in school, I think that would be a wonderful thing. I order you to forego basketball for one year and concentrate on putting something here (pointing), as opposed to developing your crossover dribble, 'cause you ain't going to the NBA. All right? Sit down.

Yes, sir?

MR. ANDRE: Oh, your Honor, if I could just address a couple points that Mr. Litman made.

Mr. Litman has said that the defendant, you know, always intended to challenge the allegations here, particularly after seeing the Government's evidence.

THE COURT: Okay. Let me just stop. I don't care about all that, you know, the timing of when people are raising these claims or that claim or attempting to rebut this or rebut that. I don't care about anything other than here and now, okay? I'm not going to go back and try to figure out why people did or did not do things six months ago. All right?

MR. ANDRE: Fair enough.

THE COURT: I just want to move on.

MR. ANDRE: Okay. The Government is still concerned, though, that when Mr. Litman says, you know, the advice he's given his client is somehow mitigating his flight risk, that Mr. Litman is giving him bad advice.

THE COURT: You don't think so?

MR. ANDRE: Pardon me?

THE COURT: You don't think so? It's that fear that a defendant has that he's getting ready to go away for life that will motivate him to flee. If he thinks he's going to get probation, there's no motivation to flee.

MR. ANDRE: I think despite Mr. Litman's analysis and reference to sentencing entrapment, we don't believe that those -- that that theory is available post *Delaney* and post *Cortez* for a court to apply at sentencing. Those are jury issues. And to be sure, a jury could find sentencing entrapment in this case, but for Mr. Litman to stand here and say he predicts his client will get four years, perhaps time served, the Government's position is this: He's much more likely to get 15 years, and that's if he goes to trial and the jury makes the appropriate findings given that sentencing entrapment is no longer a basis for a sentencing court to not impose an otherwise mandatory minimum.

With respect to the basketball explanation, you know, I used to go play pickup basketball at the Whitman Center. I know your Honor mentioned UCLA. That's not the same as being

on the basketball team. And all that we've effectively heard here is that Mr. Dunlap is playing basketball at the same facility maybe with some members of the team who happened to be there, but that's the not the same as what was represented to the Government and to the Court earlier.

THE COURT: I understand. I don't even care.

MR. ANDRE: Well, if I could make one last point with respect to Mr. Whitfield -- Mr. Dunlap. Mr. Litman has claimed that Dunlap never intended to do this job, to join this conspiracy. Yet now he's also trying to say that his boasting about the robbery, the Western Union and check cashing store, were puffery to get the job, puffery to get the job he never intended to do. I don't see how these two arguments are reconcilable in this case.

THE COURT: Okay.

MR. ANDRE: So in light of that, you know, the Government continues to believe that nothing that we've heard from Mr. Dunlap mitigates his flight risk and detention here.

THE COURT: Okay. Thank you.

Ms. Chahin.

MS. CHAHIN: Yes, your Honor. At the podium?

THE COURT: Make yourself comfortable. I don't care where you are.

MS. CHAHIN: Your Honor, initially I would ask to join in the statements made by Mr. Litman on behalf of

Mr. Dunlap. Most of them apply to Mr. Whitfield as well.

I'd like to start by saying the Pretrial Services report that your Honor has is the report that was prepared when he was arrested.

THE COURT: Uh-huh.

MS. CHAHIN: And so because of that, at that time he did not interview. At that time there were no known bail resources. And a new report, unfortunately, has not been prepared for this hearing, but we do have a surety. It is his aunt, Constance Cash, who has been really a maternal figure in his life. I'm not sure if the Court recalls, but Mr. Whitfield had a very difficult upbringing with his mother in Bakersfield, and for the greater part of his life has lived here in the Southern California area with his aunt, Constance Cash, and taking care of his elderly grandmother who was suffering from Alzheimer's. So when he was down here in Los Angeles, he would spend some time taking care of her, taking care of the grandmother, living in their residence.

Ms. Cash is willing to have Mr. Whitfield again live with her if he's released on bail so he can continue to assist in his grandmother's care. And if the Court found it necessary, he would even be willing to wear an ankle bracelet or some sort of monitoring device, if the Court deemed that that were necessary.

In regard to the amount of time that Mr. Whitfield could

be facing, we've discussed it. Your Honor previously sentenced the most culpable defendant in this case to 72 months. And that was at the time when your Honor knew far less about this case than your Honor does now. So I think that's an important factor that knowing what the Court knows now, in light of the way that the Court has ruled in this case, it's possible that our clients might even be looking at a lesser sentence than that.

Additionally, as your Honor knows these facts as well as any of us do here, any statements of violence that might have been made by these defendants during the time of this -- this offense, the Court has already determined and ruled that much of that information was goaded by the Government agents in this case.

With respect, your Honor, to -- I think I explained that he has had a difficult upbringing. The area where he grew up was a very difficult area for a young man to grow up in. I think in my sentencing papers I did submit some statements from local neighbors who describe how difficult it is for a young man in that area not to become involved in gangs, not to have to need to possess the weapon. And in fact, the one conviction for possession of weapon Mr. Whitfield does have sometime back, he was convicted of having a weapon in his possession shortly after he had been shot himself. So because he was shot, he felt it necessary to have a weapon to protect himself and

that's how he came upon that conviction.

Additionally, he does have an attempted rape conviction at a very early age, and I think in my sentencing papers I did also explain what the circumstances were that led up to that conviction.

So I would ask the Court to consider that that is remote in time and that at this point, your Honor, I believe that there are conditions that could mitigate the danger that he might present to the community or -- and that he is not a risk of flight.

So I would ask your Honor to -- if the Court deemed it necessary, Ms. Cash could be here and she could represent to the Court that she would be willing to act as a surety for him.

THE COURT: Okay. All right. Here's what I'm going to do.

And Pretrial Services officer is here, and I want you to come forward, sir. But here's what I'm going to do.

I'm going to grant their release on their personal recognizance, but I am going to put them on curfew and electronic monitoring. I am going to insist that both of them seek either employment or enroll in school, refrain from use of any narcotics or dangerous drugs, and any other conditions, reasonable conditions that Pretrial Services wants to impose.

In fact, just for the record and for the benefit of the CRD, would you please go through them now?

THE PRETRIAL SERVICES OFFICER: Yes, your Honor.

Pretrial Services is recommending intensive Pretrial Services supervision; surrender all passports to pretrial or sign a declaration with the Clerk of Court not apply for the issuance of a passport during the pendency of the case; travel restricted to the Central District of California; not enter premises of any airport, seaport, railroad, or bus terminal which permits exit from the continental U.S. or area of restricted travel without court permission; reside as approved by Pretrial and do not relocate without prior permission from Pretrial; maintain or actively seek employment and provide proof to Pretrial and/or maintain or commence an educational program and provide proof to Pretrial; avoid all contact directly or indirectly with any person who is or who may become a victim or potential witness in the subject investigation or prosecution, including, but not limited to, co-defendants, except in the presence of counsel; not possess any firearm, ammunition, destructive devices, or dangerous weapons.

In order to determine compliance, you will agree to submit to a search of your person and/or property by Pretrial Services in conjunction with the U.S. Marshal; not use or possess -- not use or possess any identification other than in your own legal or true name; not use or possess illegal drugs; submit to the search condition in conjunction with U.S. Marshal; comply with any current probationary terms and/or parole terms; participate

in one of the following home confinement programs and abide by all the requirements of the program which will include electronic monitoring; under the curfew component, the curfew to be determined by Pretrial Services.

And we'd ask that the Court impose a release to Pretrial Services so we can place a bracelet on him.

THE COURT: All right. Then that will be the order. He will be released directly to a representative of Pretrial Services.

THE PRETRIAL SERVICES OFFICER: We'd also ask your Honor for a drug testing condition as directed by Pretrial Services.

THE COURT: All right. You will submit to drug tests, random drug tests, at a frequency not to exceed eight tests per month as directed by Pretrial Services. You are to refrain from the use of any narcotics or dangerous drugs. You are also to avoid the use of prescription medications and you are to refrain all together from the ingestion of alcoholic beverage. Clear?

THE DEFENDANT WHITFIELD: Clear.

THE DEFENDANT DUNLAP: (Nods head.)

THE COURT: I want to make one other thing clear. I'm taking a chance on both of you gentlemen, all right? If you violate the Court's trust, naturally I will issue a warrant for your arrest and you will be detained pending trial. One

other thing. I am the one who will be sentencing you.

Yes, sir?

MR. ANDRE: Oh, your Honor, if I may, would the Court grant the Government a brief stay of their release pending an appeal of the Court's release orders so as to facilitate Ninth Circuit review?

THE COURT: Do what you have to do. The answer's no.

MR. ANDRE: Okay. Secondarily, your Honor, pursuant to *United States vs. Cordero*, *United States vs. Wheeler*, the Court to facilitate appellate review is supposed to issue either written findings or oral findings when granting a release order. Is --

THE COURT: If I have not made it clear already, I find that these two gentlemen do not pose a risk to society. I certainly don't believe that they pose a flight risk, and I certainly believe that there are conditions or combination of conditions which will assure both their appearance at trial and assure that they do not pose any danger to the community.

MR. ANDRE: Is that to rebut the statutory presumptions, your Honor, or is the Court not applying --

THE COURT: Even though I doubt seriously that the presumptions apply, yes.

MR. ANDRE: Thanks, your Honor.

THE COURT: Okay. Thank you.

Anything else?

All right. Deputies, they belong to you.

MR. LITMAN: Thank you.

MS. CHAHIN: Thank you.

THE COURTROOM DEPUTY: The Court is adjourned.

(Proceeding concluded at 2:07 P.M.)

CERTIFICATE OF OFFICIAL REPORTER

I, DEBRA READ, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE, THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 19TH DAY OF JUNE, 2014.

/S/ DEBRA READ

DEBRA READ, CSR NO. 3949, CRR
FEDERAL OFFICIAL COURT REPORTER